## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-18-HAB |
| | ) | |
| MARCUS B. ROBERSON | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) engaged in a series of narcotics buys and executed residential search warrants that yielded substantial evidence of drug trafficking activities, Defendants Marcus B. Roberson (Roberson) and Jason Smith (Smith) were charged in a ten-count indictment with controlled substance and firearm offenses. Roberson now moves to suppress the evidence found inside houses on Faulkner Court in Fort Wayne, Indiana, and on Woodridge Drive in New Haven, Indiana. (ECF No. 38). Roberson challenges the probable cause for issuance of the search warrants for these properties and the veracity of the averments in the search warrant affidavits. He requests an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). The motion is fully briefed (ECF Nos. 38, 40, 45), and ripe for consideration. Because the Court finds that the warrants were properly issued, supported by probable cause, and no Fourth Amendment violation occurred, the Motion to Suppress will be denied.

## SEARCH WARRANT AFFIDAVIT

On March 14, 2022, ATF Special Agent Tom Kaiser (SA Kaiser)[1] applied for search warrants to search three residences (ECF No. 42, 1:22-MJ-46 and 1:22-MJ-47), hereinafter "the

---

[1] SA Kaiser has been a special agent with the ATF since January 2016 and is assigned to the ATF Fort Wayne, Indiana field office.

Woodridge residence," "the Faulkner Court residence," and "the Gilbert Drive residence." To say that the investigation of this case was extensive does not do it justice; it spanned over 18 months and involved staged and stationary surveillance, two confidential informants, multiple federal subpoenas and preservation requests to cellular carriers, and active pen registers. The investigation prompted a 36-page search warrant affidavit containing the following condensed factual recitation[2]:

In the summer of 2020, the ATF began investigating Chad Billington (Billington) for suspected firearms and narcotics trafficking offenses. Billington's criminal history involved multiple felonies, including narcotics felonies. (Aff. ¶ 1). Although most of the ATF's interactions with Billington do not involve Roberson, the Court summarizes those interactions to provide context for those that do.

In February 2020, a long-time ATF confidential informant (ATF CI) relayed information to the ATF that Billington had contacted the ATF CI to ask about his interest in firearms and narcotics. The ATF CI had worked with the ATF for eight years, had been a consistent and reliable source of information, and had no criminal violations since becoming an ATF CI. The ATF CI also had no local arrests or convictions for any charges involving dishonesty. (Aff. ¶ 2).

From March 2020 through June 2020, Billington and the ATF CI communicated via text messages and voice calls discussing prices and narcotics quantities Billington had for sale. The ATF CI lost contact with Billington in July 2020 but resumed contact with Billington on Facebook Messenger in November 2020. Once reconnected, the ATF CI learned that Billington had changed

---

[2] ECF No. 42 was filed as one document that contains the Warrants, the Applications, and the Affidavits. The Affidavits begin at pages 14 and 63 and appear to the Court to be identical. For this reason, references to the Affidavits in this Opinion and Order refer to the numbered paragraphs in the Affidavits, "Aff. ¶ ___."

his telephone number and Billington provided that new telephone number to the ATF CI. (Aff. ¶¶ 3-4).

From November 19, 2020, through December 8, 2020, the ATF CI and Billington exchanged 114 text messages through the new telephone number, ending in –2768. The ATF monitored these messages, many of which included discussions about the purchase/sale of methamphetamine, transaction locations, and prices. On November 20, the ATF CI brokered a narcotics transaction for a half-ounce of crystal methamphetamine from Billington, which field tested positive for methamphetamine. The next day, Billington contacted the ATF CI via text to see if the ATF CI was satisfied with the purchase and conveying he could obtain more drugs for the ATF CI. (Aff. ¶¶ 6-7).

The affidavit provides specific details of continued communications in early December 2020 between the ATF CI and Billington, not all of which need be recounted here. On December 4, 2020, the ATF CI set up a purchase of a half-ounce of methamphetamine from Billington at his residence on Elmwood Avenue, Fort Wayne, Indiana.[3] During the transaction, in which the ATF CI bought a half-ounce of methamphetamine, Billington and the ATF CI discussed prices and quantities for follow-up purchases. The ATF CI asked about the price for a quarter pound of methamphetamine. Billington then texts an unknown individual, believed to be Roberson, before finishing the discussion of the final price. (Aff. ¶¶ 8-9).

On December 8, 2020, the ATF CI and an undercover Special Agent (the UC) drove to Billington's house to purchase four ounces of methamphetamine. While the ATF CI and UC waited in the house, Billington counted the money ($2,500.00) and contacted his source. A few

---

[3] The ATF confirmed that Billington was residing at the Elmwood Avenue address based, in part, on Billington's statements to the ATF CI that he resided there and had recently sold a firearm on behalf of his roommate. The ATF confirmed that Billington's roommate has registered vehicles at the Elmwood Avenue address.

minutes later, Billington received a phone call, retrieved the money, and exited the residence. ATF surveillance units observed a vehicle arrive and park in the rear of the residence. The vehicle's license plate returned to Roberson, a black male. Billington returned to the house with the drugs and told the ATF CI, "my guy know you, he told me to tell you hello." (Aff. ¶13). The ATF CI asked who it was but Billington refused to say. The ATF CI then asked if the person used to work with them. Billington responded affirmatively and said, "black guy." The ATF CI then said "Marcus?", but Billington did not reply. (Aff. ¶ 13). Billington provided four ounces of a substance that field tested positive for methamphetamine. This was the first time Billington and Roberson were linked to one another in the affidavit.

After this transaction, the ATF CI again lost contact with Billington. So, on January 29, 2021, SA Kaiser instructed the ATF CI to send a recorded text message to a cellular number ending in –5659 that the ATF CI had saved in his phone contacts as a number for Roberson.[4] The ATF CI explained that he no longer had contact information for Billington and was hoping Roberson could help. Throughout 2021, the ATF CI maintained cellular contact with Roberson via –5659 until Roberson advised the ATF CI of his new telephone number, ending in –9152. In June 2021, the ATF CI texted Roberson to try to set up a controlled purchase for four ounces of methamphetamine but Roberson explained to the ATF CI that he was having trouble procuring the methamphetamine. (Aff. ¶¶ 14-15).

In early August 2021, SA Kaiser, and Detective Rod Hormann with the Allen County Drug Task Force met with an Allen County Police Department confidential informant (the ACPD CI). No information about this informant's criminal history, reliability, or background is in the affidavit. The ACPD CI told investigators that he had purchased methamphetamine from

---

[4] From the pleasantries exchanged during the text communications, the ATF believed the individual using the telephone number ending in –5659 was, in fact, Roberson.

Roberson. SA Kaiser asked the ACPD CI to confirm the phone number used to contact Roberson and the ACPD CI provided the telephone number ending in –9152, previously used by the ATF CI to contact Roberson. The ACPD CI added that he knows Roberson to reside in New Haven, Indiana, and that he drove multiple vehicles including a GMC truck and a Chevy Impala. All this information tracked information known to the ATF. The ACPD CI stated he had bought large quantities of methamphetamine from Roberson and was willing to conduct a controlled buy. (Aff. ¶ 16).

That controlled buy was started in mid-August when the ACPD CI contacted Roberson via the –9152 number to purchase two ounces of methamphetamine. More text messages established a time and location for the buy. On August 17 at about 5:57 PM, the ACPD CI, driven by an ATF UC, arrived at the New Haven Car Wash in New Haven, Indiana. A few minutes later, a GMC truck arrived. The ACPD CI identified the driver of the truck as Roberson. The ACPD CI then procured 58 grams of a substance, later testing positive for methamphetamine. ATF surveillance units confirmed the license plate of the GMC Truck as TK799NXV, registered to Roberson at the Faulkner Court residence. (Aff. ¶ 16).

By early September, ATF learned that Roberson was no longer using the –9152 number. In mid-September, the ACPD CI confirmed that Roberson was using a different number, ending in –0699. Around this time, law enforcement began suspecting that the ACPD CI was purchasing narcotics from Roberson outside the direction of law enforcement and was failing to report his interactions with Roberson. (Aff. ¶¶ 17-18).

On October 8, the ATF CI received a text message from an unidentified individual with a telephone number ending in –3119. In the message, the individual mentioned "Marcus" and said, "he said u was looking." (Aff. ¶ 19). SA Kaiser directed the ATF CI to set up a buy for four ounces

of methamphetamine. (*Id.* ¶¶ 20-21). The ATF CI set up the buy, which was to occur on October 14 at the Gilbert Drive residence.

In preparation for the buy, pre-surveillance units set up around the Gilbert Drive residence. These surveillance units observed a heavy-set white male standing in the window of the residence, eventually exiting and standing in the driveway when the ATF CI arrived. Agents observed a grey Chevrolet Impala also pulling into the driveway of the residence. (Aff. ¶¶ 21-22)

During his post-buy debriefing, the ATF CI stated that the unidentified male entered the vehicle and produced four ounces of methamphetamine. The ATF CI confirmed the purchase price and told the unidentified male that another source had provided methamphetamine to the ATF CI from Roberson. The unidentified male, nicknamed "Big", stated that Roberson had "just been laying low." The transaction was then concluded. (Aff. ¶ 23).

After the buy, ATF Intelligence Research Specialist Jake Edwards (Specialist Edwards) compiled data on the address and vehicle observed during the transaction. Surveillance units identified the previously unidentified male as co-Defendant Smith, who was known by law enforcement as the ACPD CI. (Aff. ¶ 23).

This is where things get interesting. The ATF CI lost contact with Smith after the above deal. But armed with the knowledge that Smith, now a rogue CI, was working with Roberson, SA Kaiser and the ATF CI hatched a plan for the ATF CI to contact Smith at the Gilbert Drive residence. The plan went something like this: the ATF CI would drive an ATF UC vehicle, equipped with stationary video recording equipment, to the Gilbert Drive residence, reestablish contact with Smith, and purchase methamphetamine. (Aff. ¶¶ 24-25).

So, on December 2, the ATF CI arrived at the Gilbert Street residence and parked the UC vehicle in the driveway. Via the in-car video recorder, SA Kaiser observed the ATF CI approach

the residence door. The ATF CI was also wired with live recording devices transmitting live audio. The ATF CI knocked on the door and an unknown female answered. The ATF CI asked if "Big" was available. Smith then came to the door. The ATF CI explained that he had been trying to contact Roberson and Smith but had been unsuccessful. The ATF CI also told Smith that he needed to purchase more methamphetamine. Smith stated that he was currently waiting to "reup" his supply of narcotics. Smith then made a phone call to Roberson to inquire how long it would take to get the methamphetamine.[5] The ATF CI and Smith concluded their meeting with the ATF CI stating he would contact Smith later.

After a same-day post-operational briefing between the ATF CI and SA Kaiser, SA Kaiser directed the ATF CI to text Smith and ask to purchase four ounces of methamphetamine. The ATF CI did so and negotiated a price of $400 an ounce. Smith explained that the narcotics would be dropped off later that evening. (Aff. ¶ 30).

Throughout the day, SA Kaiser and Specialist Edwards monitored stationary video cameras at Roberson's residence on Woodridge Drive and at Smith's Gilbert Drive residence. Agents were also monitoring the pen register for Roberson's number. Based on this monitoring, 11 text messages were exchanged between Roberson and Smith after the ATF CI first left the Gilbert Drive address. (Aff. ¶31).

At 8:24 pm, Roberson placed a brief call to Smith's phone. Six minutes later, surveillance identified a male individual leaving the Woodridge Drive residence, entering a dark grey Chevrolet Impala, and departing the residence. At 8:52 p.m., the stationary camera at the Gilbert Drive

---

[5] The ATF had an active pen register for the number identified to Roberson ending in –0699. When the ATF CI observed Smith placing a call, a call was received by Roberson's –0699 number and recorded as a call from telephone number ending in –6652. The number ending in –6652 was confirmed to belong to Smith. Smith and Roberson discussed how long it would take to bring the narcotics and concluded the call.

residence captured a vehicle arriving. Staged surveillance units conducted a drive-by of the Gilbert Drive residence and identified a dark grey Chevrolet Impala registered to Roberson in the driveway. At 8:54 p.m., the ATF CI received a text message from Smith stating, "Come on ready." (Aff. ¶32). The ATF CI arrived at the Gilbert Drive residence, texted Smith, and Smith came outside and entered the ATF CI's vehicle. Smith provided the ATF CI with the narcotics, which later field tested positive for methamphetamine, and completed the transaction. (*Id.*). ATF surveillance units on the scene followed the Chevrolet Impala as it left the Gilbert Drive address. Surveillance units followed the Impala and advised SA Kaiser, who was monitoring the stationary cameras at the Woodridge Drive residence, when the Impala turned onto Woodridge Drive. SA Kaiser confirmed that the Impala arrived at Roberson's residence. (Aff. ¶¶ 33-34).

The affidavit details ongoing text message communications after the December 2 transaction between the ATF CI and Smith about the availability of narcotics for purchase. (Aff. ¶¶ 37-40). The next engagement of any consequence occurred on February 10, 2022. Much like the December 2 transaction, the ATF had staged surveillance units in the area and monitored stationary surveillance cameras. This surveillance identified a white SUV leaving from the Gilbert Drive residence and returning to that residence about 30 minutes later. Shortly after, the ATF CI and an ATF UC arrived at Gilbert Drive. Smith instructed the ATF CI and the ATF UC to enter the residence. But the ATF CI told Smith they wanted to conduct the transaction in their UC vehicle and Smith agreed.

A few minutes later, the ATF UC observed Smith exit the Gilbert Drive residence, walk toward the UC vehicle, and enter the back passenger side of the UC vehicle. Smith provided the ATF UC a plastic baggie containing a substance later confirmed to be methamphetamine. The ATF UC inspected the bag, retrieved a digital scale, and weighed the substance. The ATF UC said that

Smith was "short" as the methamphetamine weighed 3.8 ounces. Smith told the ATF UC he had another ball (1/8 ounce) inside the house and would retrieve it. The ATF UC then handed Smith the agreed upon $1,400.00 in pre-recorded buy money. Smith exited the vehicle and returned to the residence to retrieve the other methamphetamine. (Aff. ¶¶ 41-46).

Shortly after, Smith returned with the additional methamphetamine. The ATF UC told Smith he wanted to order a larger quantity next time. The affidavit provides details of the conversation between Smith and the ATF UC. Throughout the conversation, Smith references "Marcus" and the ATF UC asks if "Marcus" could get the UC a "P" (one pound). Smith told the ATF UC that Marcus was in Atlanta and when he returned home Smith would let the ATF UC know.

On March 9, 2022, Indiana State Police Detective Nick Hoffman (Det. Hoffman) conducted mobile surveillance at the Faulkner Court residence. In the driveway he observed a white Chevrolet Traverse with Indiana passenger plate SAJ462 registered to Roberson. Three vehicles are registered to Roberson at that address, including the GMC Truck driven by Roberson during the August 17, 2021, controlled buy. Information from the Allen County Assessor's Office public records search reveals that Roberson is the owner of the Faulkner Court residence. Roberson's driver's license is also linked to this address. Although the vehicles were registered to the Faulkner Court residence, throughout the investigation Roberson's vehicles had been observed parked at the Woodridge Drive residence.

In early March, law enforcement received a tip about suspected drug activity and a possible gunshot at the Faulkner Court residence. A bag of narcotics was also found near the residence. Based on his training and experience, SA Kaiser believed that Roberson operated the Faulkner Court residence as a "stash house." SA Kaiser also stated that drug traffickers rarely keep narcotics

at their primary residence where their family lives and noted that Roberson was routinely observed at the Woodridge residence with his three children. (Aff. ¶49). That said, on March 9, 2022, while monitoring a stationary video camera capturing live video of the outside of the Woodridge Drive residence, SA Kaiser observed the grey Chevrolet Impala. He observed a black male resembling Roberson exit the vehicle with a bag in his hand and enter the residence.

Based on this information, Magistrate Judge Susan Collins determined that probable cause existed to search all three residences for controlled substances and "fruits and instrumentalities" of drug trafficking crimes described in the affidavit. (See ECF No. 42, Attachment B). In executing the warrants, law enforcement located 330 grams of methamphetamine, a digital scale, $4,500 cash, and a pistol at the Woodridge Drive residence and two more firearms on the Faulkner Court premises.[6]

## DISCUSSION

Roberson challenges the probable cause for the issuance of the search warrants, as well as the reliability, veracity, and basis of knowledge of the averments in the affidavit. He moves to suppress the evidence obtained from the search of the Woodridge Drive and Faulkner Court residences. The Government opposes the motion asserting that the Magistrate Judge properly concluded that probable cause existed to believe evidence of criminal activity would be found in the residences and Roberson has failed to make a substantial preliminary showing of material falsity or omissions to warrant a *Franks* hearing. The Court turns now to these arguments.

 "The Fourth Amendment's strong preference for the use of search warrants calls for probable cause determinations by a 'neutral and detached magistrate' as opposed to 'officer[s]

---

[6] No information is provided as to whether any evidence was found at the Gilbert Drive residence. The search of that residence, however, is not relevant to the present motion to suppress and need not be discussed here.

10

engaged in the often competitive enterprise of ferreting out crime.'" *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "The application for a warrant 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *Id.* "'[A] search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information,' or by omitting material information from the affidavit provided to the issuing judge." *Id.* (quoting *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013)).

"'A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.'" *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016), quoting *United States v. Mullins*, 803 F.3d 858, 861–62 (7th Cir. 2015). That showing is not limited to false statements but applies to material omissions as well. *Hancock*, 844 F.3d at 708; *Mullins*, 803 F.3d at 862. A hearing is not mandated absent "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

Roberson asserts that SA Kaiser's affidavit both misrepresents and omits material information. His main complaints are two-fold. First, he believes that SA Kaiser identifies him in the affidavit via telephone numbers and vehicles registered to him without "actually" identifying him. (ECF No. 38 at 10). Second, he contends that the affidavit contains uncorroborated hearsay

from a confidential informant whose reliability has not been verified. He argues that the affidavit omits information about the cooperation of the ACPD CI, later found to be Smith, Smith's criminal history, and his reliability and argues that this information would have been material to the Magistrate Judge's assessment of the CI's credibility and reliability.

In turn, the Government argues that Roberson has not made the required preliminary showing to obtain a *Franks* hearing. The Court agrees with the Government that no hearing is required. The defendant's allegations of deliberate falsehood or recklessness are not supported by any offer of proof showing any intentional or reckless misconduct by SA Kaiser to warrant a *Franks* hearing. Moreover, even if Roberson were correct that SA Kaiser misrepresented or omitted facts, Roberson has altogether failed to show how those facts were material to the probable cause finding made by the Magistrate Judge.

It is generally well-understood that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca,* 380 U.S. 102, 108 (1965). For this reason, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). *Franks* does not protect against *all* omissions or misstatements in the affidavit; it protects only against *material* ones, that is misrepresentations or omissions *designed to mislead,* or that are made in *reckless disregard of whether they would mislead,* a judicial officer's probable cause determination. *See United States v. Clark,* 935 F.3d558, 563 (7th Cir. 2019) ("Our cases do not hold that a *Franks* hearing is required every time some substantial adverse information about an informant's credibility is omitted from a probable cause affidavit.").

Roberson suggests that when SA Kaiser first identifies him in the affidavit he intended to mislead the Magistrate Judge. He contends that SA Kaiser misrepresented in the affidavit that

12

Roberson was texting with the ATF CI when he had no actual knowledge that it *really* was Roberson texting with the ATF CI. Similarly, he argues that although agents observed a vehicle registered to him arrive at Billington's residence during the December 8, 2020 transaction he is not affirmatively identified as the driver. Thus, he seemingly argues it could have been anyone talking to the ATF CI and anyone driving his vehicle, yet SA Kaiser suggests otherwise.

But SA Kaiser did not pull Roberson's name out of thin air – the facts that occurred after the December 8 transaction also informed his statements. Agents may draw reasonable inferences from their experiences. *See generally*, *Heien v. North Carolina,* 574 U.S. 54 (2014) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 185 (1990)) ("[W]hat is generally demanded of the many *factual determinations* that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable.") (original emphasis). "A statement in a warrant affidavit is not false merely because it summarizes or characterizes the facts in a particular way." *United States v. Hare*, 772 F.2d 139, 141 (5th Cir. 1985). And in the context of this long-term investigation and when SA Kaiser applied for the warrant, agents had gathered considerable evidence, from various sources – pen registers, physical surveillance, public records, controlled buys, and undercover agents – pointing to Roberson's involvement in drug trafficking.

Further, as the Government points out, the totality of the circumstances set out in the affidavit supplies the necessary reliability and corroboration and solidifies Roberson's connection with the various drug transactions. Indeed, the affidavit contains ample evidence showing that as the investigation evolved so did the agents' efforts to positively identify Roberson as the person interacting with the ATF CI and Smith. Pen registers and federal subpoenas to cellular telephone carriers identified telephone numbers belonging to Roberson. At the same time phone calls were

exchanged, officers observed vehicles registered to Roberson leaving the Woodridge Drive residence and arriving at the Gilbert Drive residence.

As for the reliability of Smith as the ACPD CI, Roberson is correct that there is no information in the affidavit about Smith's informant activities – no evidence of his criminal history, recent arrests, prior reliability, or any other information. Yet the mere fact that the affidavit omitted information about the informant's criminal background or a motive to provide information against the defendant will not destroy the probable cause determination where the rest of the affidavit establishes reliability. *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006); *see also Clark*, 935 F.3d at 565 ("Our *Franks* hearing cases show that when police have sufficiently corroborated an informant's tip, the omission of facts pertaining to the informant's credibility may not be material."). Here, as the Government points out, Smith knew where Roberson lived, what cars he drove, and confirmed that the cell number the ATF CI was using to contact Roberson was Roberson's number. He stated he could set up a controlled buy and did so. All these facts lend some element of credibility to Smith – at least until agents became suspicious of him.

Roberson argues that the Magistrate Judge should not have considered the controlled buy at all because Smith was an unreliable CI and the controlled buy is therefore flawed. But as the Government points out, Smith conducted the controlled buy in the presence of an ATF UC, which provides an indicium of reliability that would not exist if Smith had conducted the buy alone. Further, the Magistrate Judge was fully aware that Smith had gone off the rails – SA Kaiser didn't keep it a secret. He was forthright in the affidavit that Smith was believed to be engaging in outside purchases with Roberson and the affidavit reflects that Smith quickly became a target in the investigation. If anything, this is evidence that SA Kaiser did not intend to mislead the Magistrate Judge or provide misinformation.

14

Simply put, the Court does not find that the affidavits contained deliberate falsehoods or a reckless disregard for the truth. The Magistrate Judge was provided specific details of Roberson's involvement in drug transactions with the ATF CI, Billington, and Smith. She was also provided truthful information that Smith turned out to be a lousy informant. Roberson provides no offer of proof that SA Kaiser deliberately made misstatements or omissions with the intent to mislead the Magistrate Judge.

That leaves us with the four corners of the affidavit itself. This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

SA Kaiser's affidavit (and the inferences the Magistrate Judge may draw from the affidavit)[7] leaves no doubt that the Magistrate Judge properly determined that probable cause

---

[7] "[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018).

existed to search the Faulkner Court and Woodridge Drive residences for evidence of drug trafficking activities. While Roberson views the evidence piecemeal, the totality of the circumstances here connects all the dots. See *United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021) ("When we evaluate a probable cause finding, we do not view the individual facts in isolation.").

SA Kaiser was an experienced ATF agent working with an experienced, consistent, and reliable ATF CI. The prolonged investigation supported probable cause to believe that Roberson participated in drug trafficking along with Smith. Law enforcement purchased narcotics from three individuals: Billington, Smith, and Roberson. The individual who arrived to bring drugs to Smith and Billington drove Roberson's car, returned to Roberson's home at Woodridge Drive, and used phones linked to Roberson. While Roberson points out that there is no direct evidence pointing to any drug trafficking inside the Woodridge Drive and Faulkner Court residences, there need not be. "Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site." *United States v. Orozco,* 576 F.3d 745, 749 (7th Cir. 2009) (citation and internal quotation marks omitted). And courts are "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense, and specifically, in the case of drug dealers, evidence is likely to be found where the dealers live." *Id.* (citation and internal quotation marks omitted).

Roberson lived at the Woodridge Drive address and had vehicles registered to the Faulkner Court address. In each of the latter transactions, SA Kaiser detailed calls between Roberson and Smith related to drug transactions and surveillance showed Roberson leaving his Woodridge Drive residence, arrive at the Gilbert Street residence, presumably to drop off drugs to Smith and then return home. Based on the crime intelligence tip received in March 2022, which reported comings

and goings consistent with drug trafficking at the Faulkner Court residence, and SA Kaiser's training and experience that drug traffickers often use stash houses, the Magistrate Judge properly concluded that the evidence was enough to create a fair probability that the Woodridge Drive and Faulkner Court residences contained evidence of a crime.[8]

On a final note, Roberson makes an undeveloped argument that any inculpatory information contained in the affidavit connecting Roberson's drug trafficking activities to the Woodridge Drive address is stale and does not support a probable cause determination. But the Seventh Circuit has held that "passage of time is less critical when the affidavit refers to facts that indicate ongoing criminal activity." *United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006) (quoting *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999). Here, the affidavit established that Roberson was engaged in an ongoing business of drug trafficking activities that could reasonably involve the storage of drugs in his home or in a stash house. For this reason, the passage of time was less important to the probable cause determination. The Motion to Suppress is DENIED.

## **CONCLUSION**

For the reasons above, the Defendant's Motion to Suppress and the request for *Franks* hearing contained therein is DENIED. (ECF No. 38). The Court shall set this matter for trial by separate minute entry.

SO ORDERED on November 10, 2022.

s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[8] Because the Court finds probable cause existed for issuance of the warrants, the Court need not address the officers' good-faith reliance on the warrant.